USA v. Scarpa

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2016

(Argued:  January 17, 2017                    Decided:  June 22, 2017)

Docket No. 16-303

_____

UNITED STATES OF AMERICA,

*Appellant*,

- v. -

GREGORY SCARPA, JR.,

*Defendant-Appellee.*[1]

_____

Before:  KATZMANN, *Chief Judge*, KEARSE and LIVINGSTON, *Circuit Judges*.

The United States appeals from an order and second amended judgment of the United States District Court for the Eastern District of New York, Edward R. Korman, *Judge*, reducing by 120 months the 482-month term of imprisonment imposed on defendant Gregory Scarpa Jr. in an amended judgment in 1999 following his conviction of racketeering and other offenses.  The district court ordered the reduction pursuant to Fed. R. Crim. P. 35(b) on the basis that Scarpa in 2005 provided substantial assistance to the government leading to the discovery of explosives components stored 10 years earlier in the then-home of Terry Lynn Nichols, a convicted coconspirator in the 1995

---

[1]The Clerk of Court is directed to amend the caption as shown above.

bombing of the Alfred P. Murrah Federal Building in Oklahoma City. The court reduced Scarpa's sentence without a motion by the government--and over its opposition--ruling principally that a government motion was not required because the court found (a) that Scarpa had rendered substantial assistance, (b) that a 2012 affidavit filed by the government at the request of the court erroneously stated, *inter alia*, that the 2005 search of the then-unoccupied former Nichols home was conducted pursuant to a search warrant rather than on the consent of a real estate agent, (c) that the government declined to provide detailed evidence as to the negative factors in the cost-benefit analysis that led it to refuse Scarpa's request for a sentence-reduction motion, and (d) that the government's statement in 2010 that Scarpa had a prior history of sham cooperation and attempts to pervert the criminal justice system was merely a post-hoc rationalization of its 2005 refusal to make a sentence-reduction motion. On appeal, the government contends principally that its decision not to move for a sentence reduction for Scarpa was justified by, *inter alia*, its consistent concerns about his prior sham proffer of cooperation, his other pre-2005 attempts to obstruct justice, and his 2005 polygraph examination indicating untruthfulness with respect to the Nichols matter, and that the court misapplied applicable legal standards in concluding that the requested sentence reduction could be granted to Scarpa in the absence of a motion by the government. We agree with the government's contentions.

Order and second amended judgment reversed. The matter is remanded for reinstatement of the first amended judgment.

AMY BUSA, Assistant United States Attorney, Brooklyn, New York (Robert L. Capers, United States Attorney for the Eastern District of New York, David C. James, Patricia E. Notopoulos, Assistant United States Attorneys, Brooklyn, New York, on the brief), *for Appellant*.

GEORGIA J. HINDE, New York, New York, *for Defendant-Appellee*.

KEARSE, *Circuit Judge*:

The United States appeals from an order and second amended judgment of the United States District Court for the Eastern District of New York, Edward R. Korman, *Judge*, reducing by 120 months the 482-month term of imprisonment imposed on defendant Gregory Scarpa Jr. ("Scarpa") in an amended judgment in 1999 following his conviction of racketeering and other offenses. The district court ordered the reduction pursuant to Fed. R. Crim. P. 35(b) on the basis that Scarpa in 2005 provided substantial assistance to the government, leading to the discovery of a cache of explosives components stored 10 years earlier in the then-home of Terry Lynn Nichols, a convicted coconspirator in the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City. The court reduced Scarpa's sentence without a motion by the government--and over its opposition--ruling principally that a government motion was not required because the court found (a) that Scarpa had rendered substantial assistance, (b) that a 2012 affidavit prepared by the government at the request of the court erroneously stated, *inter alia*, that the 2005 search of the then-unoccupied former Nichols home was conducted pursuant to a search warrant rather than on the consent of a real estate agent, (c) that the government declined to provide detailed evidence as to the negative factors in the cost-benefit analysis that led it to refuse Scarpa's request for a sentence-reduction motion, and (d) that the government's statement in 2010 that Scarpa had a prior history of sham cooperation and attempts to pervert the criminal justice system was merely a post-hoc rationalization for its 2005 refusal to make a sentence-reduction motion. *See United States v. Scarpa*, 155 F.Supp.3d 234 (E.D.N.Y. 2016) ("*Scarpa*"). On appeal, the government contends principally that its 2005 decision not to move for a sentence reduction for Scarpa was consistently justified by, *inter alia*, its concerns about his mid-1990s sham proffer of cooperation and his other pre-2005 attempts to obstruct justice, as well as his 2005 polygraph responses indicating untruthfulness with respect to the Nichols matter, and that the district

3

court misapplied the applicable legal standards in concluding that Scarpa could be granted a sentence reduction in the absence of a motion by the government. For the reasons that follow, we agree with the government's contentions. We accordingly reverse the district court's order and the second amended judgment, and remand for reinstatement of the first amended judgment.

# I. BACKGROUND

Gregory Scarpa, a self-professed "made member" of the Colombo crime family, was first arrested on federal charges in 1988 and has been in custody ever since. Following a trial before Judge I. Leo Glasser, Scarpa was convicted on seven counts of a superseding indictment, including racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and narcotics trafficking offenses, in violation of 21 U.S.C. §§ 841(b)(1)(D) and 846. In February 1989 he was sentenced to 240 months' imprisonment. Other convictions would follow, leading to the judgment that was superseded by the decisions at issue on this appeal.

A. *Scarpa's 1999 Convictions and His First Attempt To Gain a Substantial-Assistance Benefit*

In 1995, while serving the 240-month sentence for his first set of convictions, Scarpa was charged with additional racketeering-related activity. In late 1998, a jury returned a verdict finding him guilty on all six counts of a superseding indictment, including extortionate extensions of credit, in violation of 18 U.S.C. § 893, and RICO conspiracy, in violation of 18 U.S.C. § 1962(d).

4

Among the racketeering acts that the jury found proven were Scarpa's conspiracies to murder four individuals, including one murder attempt that Scarpa authorized while imprisoned and awaiting trial.

In the meantime, while he awaited trial on the 1995 charges, Scarpa had been held at the Metropolitan Correctional Center in Manhattan and had occupied a cell adjacent to that of Ramzi Yousef, an avowed terrorist who was then awaiting trial for--and would later be convicted of-- organizing the 1993 bombing of the World Trade Center. In 1996, Scarpa contacted the government and stated that he had valuable terrorism-related information that he had obtained from Yousef.

In 1999, Scarpa, in connection with his sentencing on the 1995 charges, sought to have the government make a motion to the district court pursuant to § 5K1.1 of the (then-mandatory) Sentencing Guidelines ("Guidelines") for a reduced sentence on the ground that he had provided substantial assistance to the government in connection with terrorism plans of Yousef. The government opposed that request, describing in sealed affirmations its expenditure of significant resources in efforts over several months to follow up on Scarpa's information on Yousef, only to learn that Scarpa had actively misled the government and affirmatively compromised its efforts. The government concluded that in his purported attempt at cooperation, Scarpa, in collusion with Yousef, had perpetrated a scam.

At the sentencing hearing in 1999, then-District Judge Reena Raggi, who had presided over Scarpa's 1998 trial, imposed prison terms at or near the top of the Guidelines ranges applicable to his various offenses, and ordered that several of the prison terms be served consecutively. In reaching its sentencing conclusions, the court observed that Scarpa had continued to engage in heinous crimes even from his jail cell (*see* Sentencing Transcript, May 7, 1999, at 108), and that he had repeatedly perjured himself at trial in a deliberate attempt to obstruct justice (*see*, *e.g.*, *id*. at 109; *id*.

5

at 90 (Scarpa "chose to take the stand and tell a story that . . . bordered on contempt of court")). The court imposed a total prison term of 482 months, to be served consecutively to the 240-month prison term previously imposed by Judge Glasser.

The court declined Scarpa's request that the government be required to move for a § 5K1.1 reduction of his sentence, finding that there was no evidence that the government had refused to do so "invidiously" (*id*. at 35). The court found that Scarpa's purported assistance with respect to Yousef had yielded no positive results and had very little practical value (*see id*. at 12, 110); that the submissions indicated that the investigation undertaken by the government "involved tremendous expense and considerable inconvenience, not only to government agencies but also to various private entities" (*id*. at 12), making "a lot of people's lives . . . absolutely miserable" as a result of Scarpa's purported assistance (*id*. at 90); and that the government's refusal to make a § 5K1.1 motion was "in good faith" (*id*. at 110).

B. *Scarpa's Current Quest for a Substantial-Assistance Benefit*

After being sentenced in 1999, Scarpa was transferred to a maximum security prison in Colorado. From prison, he provided testimony to other district court judges in connection with crime family members' motions to overturn their convictions. However, his testimony was found to be problematic. In adjudicating a motion for reduction in sentence filed by another crime family member, Judge Weinstein of the Eastern District of New York, after hearing video testimony by Scarpa, found Scarpa "to be not credible." *Orena v. United States*, 299 F.Supp.2d 82, 84 (E.D.N.Y. 2004). Judge Sifton of the same district came to a similar conclusion in another case. *See Russo v. United States*, No. 03-cv-2059, slip op. at 56-57 (E.D.N.Y. Nov. 24, 2004).

6

Soon thereafter, Scarpa embarked on his current quest for a substantial-assistance benefit. At the prison in Colorado, he propitiated another terrorist.

1. *Events in 2005*

In early 2005, Scarpa was housed near Nichols, who had been sentenced to 161 consecutive terms of life imprisonment for his role in the Oklahoma City bombing. In February 2005, Scarpa sought, through prison officials, to speak with law enforcement agents about information he had acquired from Nichols. After receiving no response, he contacted a team of private forensic investigators, Stephen Dresch and Angela Clemente, and told them he had learned from Nichols of the existence of a bomb that might be used for an act of terrorism in the near future. On March 1, Dresch, a Michigan resident, contacted the Detroit office of the Federal Bureau of Investigation ("FBI") and summarized the information he had received from Scarpa. *See generally Scarpa*, 155 F.Supp.3d at 237.

On March 3, Scarpa was interviewed by FBI Special Agent J. Andrew Stearns. Shortly thereafter, Stearns returned with an FBI polygraph expert who conducted a polygraph examination of Scarpa. There was no immediate follow-up by the FBI because neither Stearns nor the polygraph expert believed Scarpa. According to Scarpa's fellow Colorado prisoner Emilio Bravo (a/k/a "Tito"), "Scarpa met with the FBI in early March 2005, but after he took a lie detector test, the FBI said he failed and told him never to call them again." (Declaration of Emilio Bravo dated March 26, 2013 ("Bravo Decl."), ¶ 3.) Scarpa's recollection was the same: In the polygraph examination, "one question was whether the notes I gave to Agent Stearns about Nichols' explosives were fabricated, and another question was whether I had ever lied to a corrections officer to get prison benefits. After I

7

answered no to both questions, the [polygraph] agent accused me of lying," and Stearns "told me that . . . I should never contact the government with any information again." (Declaration of Gregory Scarpa Jr. dated April 2, 2013 ("Scarpa Decl."), ¶¶ 11, 13; *see also id*. ¶ 9 (in Scarpa's initial interview with Stearns, "[i]t seemed Agent Stearns simply did not believe what I told him").)

On March 10, Scarpa was interviewed by Dresch and Clemente. Dresch attempted to pass Scarpa's information to law enforcement authorities. When that failed, he contacted a congressman, who "pressed the FBI to take action on this tip." *Scarpa*, 155 F.Supp.3d at 238 (internal quotation marks omitted). FBI agents eventually searched Nichols's former home in Herington, Kansas, on March 31 and found a hidden cache of explosives components.

In May, Scarpa's then-attorney Neil Checkman wrote to the United States Attorney's Office in the Eastern District of New York ("EDNY") to request that the government move pursuant to Rule 35(b) to reduce Scarpa's sentence based on his substantial assistance in the discovery of the Nichols explosives components. The government declined to make such a motion. Checkman reported to Clemente that

> [i]t is the position of the EDNY[ ]that Scarpa's info is suspect, its sources are suspect, and even if he[ ]did provide the info, the Eastern District is not interested in giving him Rule[ ]35 relief. I asked if they would proffer him for his additional info, and[ ]they say they do not want to spend the money or the effort. All this is based[ ]upon his pa[s]t track record.

(June 20, 2005 email from Neil Checkman to Angela Clemente; *see also* Declaration of Neil Checkman dated March 18, 2009 ("Checkman Decl.") ¶ 4 ("The [United States Attorney's] office based its position on Mr. Scarpa's cooperation efforts in the past which the office did not credit, and the office's impression that Mr. Scarpa's information and sources were suspect in the present instance as well.").)

## 2. *Scarpa's Subsequent Efforts To Compel a Rule 35(b) Motion*

In March 2006, Scarpa "supplement[ed]" a still-pending motion he had filed *pro se* in 2002 (pursuant to 28 U.S.C. § 2255, seeking to vacate his conviction on various constitutional grounds) to add, *inter alia*, a request--on the ground that he had provided substantial assistance leading to the location of the Nichols explosives components--that the district court require the government to move under Rule 35(b) for a reduction of his sentence. (*See* Scarpa Supplement[] to the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 ("Scarpa § 2255 Supplement").) Scarpa attached a report prepared by Clemente and various documents concerning the events surrounding the recovery of Nichols's bomb components. The government, by letter dated April 21, 2006, to by-then-Circuit Judge Raggi, opposed Scarpa's Rule 35(b) motion request. It incorporated by reference sealed documents it had submitted in 2002 in response to Scarpa's § 2255 motion, and stated that it would not file a substantial-assistance motion on Scarpa's behalf. The 2006 letter stated that the government had informed Checkman that there was no factual basis justifying the filing of such a motion.

In October 2006, the case was reassigned to Judge Korman, who appointed new counsel to represent Scarpa. Scarpa's new counsel eventually made clear that Scarpa was willing to forgo his constitutional § 2255 claims if the court or the government would agree to a reduction in his sentence. Over the next several years (studded with adjournments) the parties filed reports, affidavits, declarations, and memoranda in support of their respective positions. Scarpa's position was typified by his 2009 argument that the value of his assistance with respect to the Nichols explosives components was indisputable, and that therefore his past history of false testimony and "whatever the government believed about Mr. Scarpa's past cooperation efforts" were an insufficient basis for the

9

government's refusal to move to reduce his sentence. (Scarpa Memorandum in Support of Motion Pursuant to 28 U.S.C. § 2255, March 26, 2009, at 29.)

The government's response stated, for example, that Scarpa was found to have "committed perjury in testifying on his own behalf" at trial, "has continued to obstruct justice since his incarceration on the second indictment by filing false affidavits supporting motions by fellow members of the Colombo family" in two other proceedings, and had proffered "cooperation" in "the Yousef matter . . . [that] was deceptive and dishonest." (Letter from Assistant United States Attorney Patricia E. Notopoulos to Judge Korman dated April 28, 2010, at 5-6 (citing findings in the present case by Judge Raggi in 1999, and in the other cases by Judges Weinstein and Sifton in 2004, that Scarpa's sworn statements were not credible).) The government also stated that Scarpa had "failed a polygraph examination . . . that was designed to test the veracity of his cooperation as to the Nichols cache," and that the government chose not to reward Scarpa "for his above-described acts of fraud upon the Court." (*Id*. at 6; *see also id*. at 7 ("where, as here, a defendant has continued to engage in criminal activity while purporting to be cooperating with the government and where the defendant has been found to have provided false information, a Rule 35(b) motion is not justified").)

C. *The District Court's Decision*

In an order dated January 4, 2016--*Scarpa*, 155 F.Supp.3d at 247--the district court granted Scarpa's motion for a sentence reduction. The court stated that under the procedural rules governing the availability of a sentence reduction based on a defendant's substantial cooperation after a sentence has been imposed, "[a] motion by the government is the threshold requirement for a reduction. Fed. R. Crim. P. 35(b)," and that the decision whether to file such a motion "is generally

left to the discretion of the government." *Scarpa*, 155 F.Supp.3d at 238 (internal quotation marks omitted). However, the court noted that

> that discretion is not entirely immune from judicial review. Indeed, in *Wade v. United States*, 504 U.S. 181, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992), the Supreme Court accepted a concession by the Solicitor General . . . [that a defendant] would be entitled to relief if the prosecutor's refusal to move was not rationally related to any legitimate Government end. . . . An obvious example of such a refusal would be one based on an unconstitutional motive, such as the defendant's race or religion. *Wade*, 504 U.S. at 186, 112 S.Ct. 1840. Ultimately, as the Supreme Court said in *Wade*, the decision not to move for a sentence reduction should be based on a "rational assessment of the cost and benefit that would flow from moving" and not on "a failure to acknowledge or appreciate [the defendant's] help." *Id*. at 187, 112 S.Ct. 1840.

*Scarpa*, 155 F.Supp.3d at 238-39 (internal quotation marks omitted).

The court "conclude[d] that a rational assessment of the cost and benefit that would flow from moving for Rule 35(b) relief was not made here." *Id*. at 239. It noted that the government did not dispute that the information provided by Scarpa had ultimately been of substantial assistance in locating the Nichols cache of explosives components. *See*, *e.g.*, *id*. at 239, 240. But it concluded that the government's refusal to move for a Rule 35(b) reduction was arbitrary and irrational, principally based on the court's view that the government had "given a series of conflicting reasons" that the court stated "d[id] not survive careful analysis," *id*. at 239, and had relied on "assertions" that the court viewed as materially and "flatly incorrect," *id*. at 241.

As to the "series of conflicting reasons," the court stated as follows:

> These reasons, given at various times, may be summarized as follows: (i) while Scarpa was the source of the information that led to the uncovering of the explosives, he somehow also took false credit for that information and his alleged embellishment of it wasted a significant amount of government resources of an unspecified nature; and (ii) *he has repeatedly obstructed justice in the past through committing perjury at his own trial*, through *providing testimony in support of his former criminal associates, which at least one*

11

*judge found not to be credible, see, e.g., United States v. Orena*, 299 F.Supp.2d 83, 84 (E.D.N.Y.2004), and *through his alleged "sham" cooperation in the Yousef case.*

*Scarpa*, 155 F.Supp.3d at 239 (emphases added).

As to government "assertions" viewed by the court as "flatly incorrect in material respects," the court stated that "[i]nstead" of making a rational cost-benefit assessment of bringing a Rule 35(b) motion for Scarpa, "reliance has been placed on an affidavit from the FBI agent who responded to Scarpa's initial request to supply information," *id*. at 241, 239--referring to a November 19, 2012 Affirmation by J. Andrew Stearns ("Stearns Affidavit"), which was submitted by the government in response to the court's request for such an affidavit, *see Scarpa*, 155 F.Supp.3d at 241 ("Because of my skepticism about the lack of any factual basis for the[ government's] claims, most of which were based on information received from the FBI rather than on personal knowledge, I asked to be provided with an affidavit from the FBI agent . . . who made the initial contact with Scarpa on March 3, 2005."). As discussed in greater detail in Part II.C. below, the court viewed the Stearns Affidavit as containing "a number of unsupported statements"--calling some of them "demonstrably inaccurate"--including (1) that "FBI agents had obtained a search warrant for Nichols's home," (2) that the information for the search warrant application "was not information that Scarpa had provided to the FBI" but had come instead from "a private investigator to whom Scarpa had previously relayed information regarding the hidden explosives," (3) "that Scarpa implied that the explosives were intended for a future bombing," and (4) that subsequent "[i]nterviews of witnesses revealed that Scarpa had fabricated portions of the information" he gave the FBI. *Id*. (internal quotation marks omitted).

Finally, while the court said it was "not suggest[ing] that it would be irrational for the U.S. Attorney to conclude that, notwithstanding the value of a defendant's cooperation, his prior

12

history simply does not justify any sentencing consideration," the court found that the government's reliance on Scarpa's prior history was "*simply a post-hoc rationalization* rather than the real reason for the refusal to file a motion to reduce Scarpa's sentence." *Scarpa*, 155 F.Supp.3d at 245 (emphasis added). The court based this conclusion on "the series" of reasons proffered by the government, which the court considered "largely implausible, contradictory, and factually unsupported," and on the "quite significant[]" fact that "the U.S. Attorney has been willing in the past to grant cooperation credit even to defendants who have committed serious crimes and have lied repeatedly during the course of their cooperation," *id*. at 245, 240.

The court concluded:

> The United States has an indisputably compelling interest in discovering and neutralizing stores of bombs hidden by domestic terrorists on American soil. It has an equally strong interest in encouraging the assistance of those individuals who happen to have information about such weapons. It does not, however, have *any* interest in making use of such truthful and accurate assistance, but arbitrarily failing to credit it based on unsubstantiated allegations.

*Id*. at 245 (emphasis in original). The court determined that it was appropriate to reduce Scarpa's sentence by 10 years. *See id*. at 246-47.

## II. DISCUSSION

On appeal, the government contends principally that its decision not to move for a sentence reduction for Scarpa was justified and explained from the outset by, *inter alia*, its concerns about his prior sham proffer of cooperation, his other pre-2005 attempts to obstruct justice, and his 2005 polygraph examination indicating untruthfulness with respect to the Nichols matter, and that the

13

court misapplied applicable legal standards in concluding that the requested sentence reduction could be granted to Scarpa in the absence of a motion by the government. We agree with the government's contentions.

A. *Government Discretion To Make a Substantial-Assistance Motion*

Once a defendant has been sentenced, the circumstances in which the court is authorized to reduce his sentence are limited. *See generally* 18 U.S.C. § 3582(c). Rule 35 of the Federal Rules of Criminal Procedure, as pertinent here, provides as follows:

**(b) Reducing a Sentence for Substantial Assistance.**

**(1) In General.** *Upon the government's motion* made within one year of sentencing, the court may reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person.

**(2) Later Motion.** *Upon the government's motion* made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved:

**(A)** information not known to the defendant until one year or more after sentencing;

**(B)** information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing; or

**(C)** information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant.

**(3) Evaluating Substantial Assistance.** In evaluating whether the defendant has provided substantial assistance, the court may consider the defendant's presentence assistance.

Fed. R. Crim. P. 35(b) (emphases added).

14

If a defendant, prior to being sentenced, has rendered substantial assistance to the government in the investigation or prosecution of another person who has committed an offense, two provisions afford the possibility of lenient sentencing "[u]pon motion of the Government," 18 U.S.C. § 3553(e) (allowing court to impose a sentence below the applicable statutory minimum); *see* Guidelines § 5K1.1 (allowing court, "[u]pon motion of the government," to impose a sentence below the Guidelines-recommended range of imprisonment). Given that these provisions in the statute, the Guidelines, and the Rules allow for sentencing lenience rewarding "substantial assistance" upon a motion by the government, the requirements and obligations of § 3553(e), § 5K1.1, and Rule 35(b) are construed similarly. *See*, *e.g.*, *Wade v. United States*, 504 U.S. 181, 185 (1992) (dealing with § 3553(e) and § 5K1.1); *United States v. Gangi*, 45 F.3d 28, 30-31 (2d Cir. 1995) ("The only practical difference between Rule 35(b) and U.S.S.G. § 5K1.1 is a matter of timing: The latter is based on substantial assistance before sentencing while the former is based on substantial assistance after sentencing. . . . [D]ue to similarity of language and function, § 5K1.1 should inform our construction of Rule 35(b).").

The "[u]pon the government's motion" language in Rule 35(b) thus "imposes the condition of a Government motion upon the district court's authority," *Wade*, 504 U.S. at 185 (discussing § 3553(e) and § 5K1.1), to reduce, as a result of the defendant's substantial assistance, a sentence that has been imposed. The government, in deciding whether to make such a motion, will ordinarily make an assessment of "the cost and benefit that would flow from moving," *Wade*, 504 U.S. at 187, taking into account factors other than the assistance itself. Thus, in *Wade*, the Court held that "although a showing of assistance is a necessary condition for relief, it is not a sufficient one," *id*., because the government has "a power, not a duty," to make a substantial- assistance motion, *id*. at 185;

15

*see also id*. at 186 ("a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing").

However, the government's "discretion when exercising that power is subject to constitutional limitations." *Id*. at 185. Thus,

> federal district courts have authority to review a prosecutor's refusal to file a substantial-assistance motion and to grant a remedy if they find that the refusal was based on an unconstitutional motive.

*Id*. at 185-86. In addition, a defendant "would be entitled to relief if the prosecutor's refusal to move was not rationally related to any legitimate Government end." *Id*. at 186; *see*, *e.g.*, *United States v. Roe*, 445 F.3d 202, 207 (2d Cir. 2006) ("'Thus, a defendant would be entitled to relief [under § 3553(e) and § 5K1.1] if a prosecutor refused to file a substantial-assistance motion, say, because of the defendant's race or religion' or for a reason 'not rationally related to any legitimate Government end.'" (quoting *Wade*, 504 U.S. at 186)); *United States v. Hernandez*, 404 F. App'x 521, 522 (2d Cir. 2010) ("We will generally not review a prosecution decision not to file a § 3553(e) motion except to ensure against unconstitutional motivation, such as race, ethnicity, religion, or a reason not rationally related to any legitimate government end."); *see also id*. ("Our *de novo* review reveals that the government's proffered reason for not making a § 3553(e) motion--Hernandez's commission of further crimes-- clearly bore a rational relationship to the government's legitimate interests in deterring crime both generally and specifically as to persons expecting sentencing consideration."); *United States v. DeFeo*, 327 F. App'x 257, 258 (2d Cir. 2009) (where the defendant "has not alleged . . . an unconstitutional motive . . . . he is entitled to relief only if he can establish that the government's reasons for refusing to file a Rule 35(b) motion were 'not rationally related to any legitimate Government end.'" (quoting *Wade*, 504 U.S. at 186)).

Although the district court acknowledged most of these principles, we conclude that the scope and nature of its inquiry in the present case exceeded its authority. In addition, we conclude that findings relied on in the court's decision are not sufficiently supported by the record.

B. *The Scope of the Court's Inquiry*

Given that the court's authority under Rule 35(b) to reduce a sentence is limited by the government's permissible exercise of discretion to refuse to move because of legitimate governmental concerns, the court may not override the government's refusal to make a Rule 35(b) motion on the basis of the court's own balancing of the costs and benefits of making such a motion. Here, these legitimate governmental concerns included, *inter alia*, findings of judges in three federal cases that Scarpa has given sworn testimony or statements that cannot be credited, along with the government's 1999 (sealed) submissions describing the prior "variety of wild-goose chases," *Scarpa*, 155 F.Supp.3d at 237 (internal quotation marks omitted), induced by Scarpa in the guise of proffering substantial assistance.

Here, the district court proceeded to conduct its own balancing, and, in so doing, imposed unwarranted constraints on the Executive Branch. For example, the court was critical of the fact that, as to the view that Scarpa lied in his March 2005 polygraph examination, the only sworn statement the government submitted to the court was the one in the Stearns Affidavit, without an affidavit from the polygraph expert. *See Scarpa*, 155 F.Supp.3d at 237. But government officials do not commonly require their investigators or fact-gatherers to submit affidavits to them for the purposes of internal decisionmaking.

Similarly, the court was apparently critical of the fact that "most of" the government's factual positions about flaws in Scarpa's attempted cooperation in the Nichols matter "were based on information received from the FBI rather than on personal knowledge," *id*. at 241. But there is no requirement, nor would it be practical to require, that the U.S. Attorney have personal knowledge of all of the events and facts related to legitimate government concerns, rather than relying on information gathered by the special agents of the FBI.

Nor, in our view, should the government normally be required to disclose the details of its investigations or procedures that informed its legitimate-government-concern-based decision not to make a substantial-assistance motion. Here, however, the district court was critical of the fact that while the Stearns Affidavit stated that the polygraph expert "determined that Scarpa had exhibited deception when questioned about the information that he was providing to the FBI, . . . Stearns . . . never explained" to the court "the basis for the conclusion that Scarpa was deceptive, nor did he provide the specific facts as to which Scarpa was less than truthful." *Id*. at 237 (internal quotation marks omitted). Willfully making materially false statements to the government is in itself a crime, and Scarpa's history of false statements was of special concern to the government in the circumstances at issue here. Such concerns cannot be deemed irrational. It was beyond the authority of the district court to penalize the government for refusing to disclose underlying facts with regard to Scarpa's statements to the polygrapher.

In sum, when the U.S. Attorney has refused to make a Rule 35(b) motion for reasons that are not invidious or unrelated to a legitimate government concern, it is not the office of the court to weigh the equities or reassess the facts underlying the government's exercise of its discretion.

18

C. *The Record in the Present Case*

Although it is unnecessary to our holding, we pause to note that to the extent that the district court conducted its own inquiry into the factual bases for the government's concerns, its assessment of the record appears flawed. As described in Part I.C. above, the court concluded that the government acted "arbitrarily" in refusing to make a Rule 35(b) motion on behalf of Scarpa because it viewed the government as relying on allegations that the court found "unsubstantiated" and as "failing to credit" information from Scarpa that the court found to be "truthful and accurate," *Scarpa*, 155 F.Supp.3d at 245; and it viewed the government's reliance on Scarpa's past history of sham cooperation and attempts to obstruct justice as "simply a post-hoc rationalization" for the refusal, *id*. Upon review of the record, we are left with the impression that some of the district court's findings were in material part unjustified.

Preliminarily, we note that to the extent that the district court--in stating that the government "reli[ed]" on the Stearns Affidavit, *id*. at 239--meant that the government relied on that affidavit in refusing to make a Rule 35(b) motion, that characterization is clearly wrong. Whatever information was communicated to the decisionmakers by Stearns, it was not by means of that affidavit. The record is clear that the Stearns Affidavit was prepared in 2012 because the court "asked to be provided with an affidavit from the FBI agent . . . who made the initial contact with Scarpa on March 3, 2005," *Scarpa*, 155 F.Supp.3d at 241. Stearns was that agent, but when the government rejected Scarpa's request for a Rule 35(b) motion in 2005, it could not have been relying on the Stearns Affidavit that was prepared seven years later.

Further, we see only one clear error in the Stearns Affidavit, *i.e.*, that Nichols's former home was searched pursuant to a warrant--an error that we do not see was material. And our review

19

of the record persuades us that other aspects of the Stearns Affidavit that the district court said were "demonstrably inaccurate," *Scarpa*, 155 F.Supp.3d at 241-42, were in fact consistent with the record. We identify below some examples that have led us to this conclusion.

1.    *The Non-Material Misstatement that "FBI agents had obtained a search warrant for Nichols's home"*

The first aspect of the Stearns Affidavit impugned by the district court--that the March 31, 2005 search of the Nichols former home had been conducted pursuant to a search warrant--was indeed erroneous. The government later acknowledged that, in fact, there had been no warrant; the home was unoccupied, and the search had been conducted on the consent of a real estate agent. Although this aspect of the Stearns Affidavit--prepared seven years after the event by an agent who was stationed in Colorado and who was not involved in the search in Kansas--was thus erroneous, and although it was reasonable to expect greater accuracy, we cannot see that the error as to whether the search was pursuant to a warrant or was consented to by the realtor was material.

2.    *The Statement that "Scarpa implied that the explosives were intended for a future bombing"*

The district court also included, as part of the group of "assertions [that] are flatly incorrect in material respects," *Scarpa*, 155 F.Supp.3d at 241, the statement in the Stearns Affidavit that "Scarpa implied that the explosives were intended for a future bombing." *Id*. Yet insufficient evidence was provided for the district court's decision to credit Scarpa's description of his conversation with Stearns instead of the account provided by Stearns. This is especially true because Stearns could reasonably have determined, based on Scarpa's tone, physical movements, and demeanor, that Scarpa

had "implied" that the explosives were intended for a future bombing even if Scarpa, in the words of his own affidavit, had "not attempt[ed]" to imply that there would be a specific future bombing (Scarpa Decl. ¶ 22). We further note that Scarpa himself submitted a document to the court titled "Letter *from Gregory Scarpa Jr.* to Angela Clemente *expressing his concern* with a statement reportedly made by Emilio Bravo *Concerning Imminent Attack* for the 10th Anniversary of the OKC Bombing. (Postmarked March 14, 2005)" (emphasis ours). Thus, the record did not support the determination that the Stearns Affidavit's statement was "flatly incorrect in [this] respect[]." *Scarpa*, 155 F.Supp.3d at 241.

3. *The Statement that subsequent "[i]nterviews of witnesses revealed that Scarpa had fabricated portions of the information that he previously provided to the FBI"*

Although the court suggested that the Stearns Affidavit's statement that post-March 31, 2005 "[i]nterviews of witnesses revealed that Scarpa had fabricated portions of the information that he previously provided to the FBI," was "flatly incorrect," *Scarpa*, 155 F.Supp.3d at 241, the court offered no explanation of why that was so. Indeed, it is clear from the record that two witnesses told the FBI precisely that. Scarpa's own 2013 declaration states that in FBI interviews after the March 31 discovery of the explosives components, "Bravo . . . and Nichols said things about me to make it appear that I had lied to the FBI" (Scarpa Decl. ¶ 20), that Bravo and Nichols "accused me of fabricating information that I gave to the FBI" (*id*. ¶ 27). And Bravo's 2013 declaration confirmed the making of those accusations. While Bravo stated in 2013 that Scarpa had told the FBI the truth as Scarpa knew it, Bravo also stated that after the explosives materials had been recovered on March 31, 2005, both he and Nichols spoke to the FBI, and "*told them that Mr. Scarpa lied* when he said the

21

explosives were going to be used in a future bombing." (Bravo Decl. ¶ 8 (emphasis added).) Whether Bravo and Nichols were lying or being truthful when they made those statements to the FBI in 2005, there is no dispute that those two witnesses in fact told the FBI that Scarpa had lied.

In sum, of the aspects of the Stearns Affidavit that the district court viewed as demonstrably false, only the statement that the search of Nichols's former home had been conducted pursuant to a warrant, rather than on the consent of the real estate agent, was erroneous, and we see no basis for viewing that error as material. Other aspects are supported by clear evidence in the record.

4. *The Finding of "post-hoc rationalization"*

Finally, the record in the present case in no way justifies the district court's characterization of the government's reliance on Scarpa's past fraudulent history as a reason to deny him a Rule 35(b) motion as "post-hoc." The Nichols explosives components were found on March 31, 2005; Checkman wrote to the government in May to request a Rule 35(b) motion; and the government promptly refused, based not only on the fact that Scarpa's 2005 information had been "suspect" but also--as Checkman reported to Clemente--"based[ ]upon his pa[s]t track record" (June 20, 2005 email from Neil Checkman to Angela Clemente). Checkman's subsequent sworn declaration gave a more formal but similar description of that 2005 explanation by the government: "*The [United States Attorney's] office based its position on Mr. Scarpa's cooperation efforts in the past which the office did not credit*, and the office's impression that Mr. Scarpa's information and sources were suspect in the present instance as well." (Checkman Decl. ¶ 4 (emphasis added).)

22

CONCLUSION

There is of course no question that the government has an interest in locating illegal stores of explosive materials and preventing them from causing harm to the public; and there is no question that Scarpa's information eventually provided substantial assistance in locating the cache of explosives components hidden in Nichols's former home. But as indicated in *Wade*, the government does not have an obligation to make a Rule 35(b) motion, and a defendant's furnishing substantial assistance is not in itself sufficient to require such a motion. Although the government may not properly withhold such a motion for a reason that is constitutionally impermissible such as race or religion, there is no semblance of any such motivation in this case. And although the government may not withhold such a motion for a reason that is not related to a legitimate government concern, the record in the present case amply supports the government's contention that its refusal to make such a motion for Scarpa was based on legitimate government concerns. Scarpa had committed perjury at his trial; in two other criminal cases he had submitted affidavits that the respective presiding judges found could not be credited; and, most relevantly, he had purported to cooperate with the government with regard to terrorism plans by Yousef while instead actively misleading the government and affirmatively compromising the investigative efforts he caused it to undertake.

Such fraudulent cries of "Wolf" not only cause the misallocation of government resources, but they also make less likely an appropriate government response if the man who cried "Wolf" subsequently sounds an alarm that is genuine. Plainly, it is a legitimate government objective to deter such fraudulent proffers, rather than to encourage them by indicating that, so long as a genuine alarm is sounded eventually, the former parade of frauds is forgiven.

23

We have considered all of Scarpa's arguments in support of the decision of the district court and have found them to be without merit. For the reasons stated above, we reverse the district court's order and the second amended judgment, and we remand for reinstatement of the first amended judgment.