Rosemond's prayer would go unanswered. A cooperation agreement was never tendered. Mem. at 10. Worse yet, the government extended cooperation agreements to five "star witnesses" who would testify against him at trial: Henry Butler, Winston Harris, Khalil Abdullah, Bryan James and Tony Martin. Mem. at 15. There was little mystery about what the next act of the pre-trial play would be.
Advised that Rosemond's lead counsel had been present at each proffer session, the trial court held a Curcio hearing to ensure that Attorney Shargel's representation of Rosemond would not create a conflict of interest or an ethical impediment presenting an obstacle to his continued *174 representation and, most important, that Rosemond was aware of his right to counsel who was conflict- and impediment-free. Namely, Attorney Shargel was a witness to Rosemond's proffer sessions and might need to take the stand to rebut the government's evidence of what petitioner had proffered. See generally Opp. Ex. E. At the hearing, Attorney Shargel represented that his recollection of the proffer sessions did not differ from that of his co-counsel, and his co-counsel could, therefore, testify, if necessary. Opp. Ex. E at 15.
At trial, Shargel's opening statement was premised on the fact that Rosemond made misstatements, or outright lies, during the proffer sessions:
[Rosemond] was going to come to the table and make a deal with the government.... He was going to cooperate, and he sat with them .... And you're going to find from the evidence in this case that Jimmy Rosemond went in and he made false accusations and false confessions....
False confessions. He said he saw things that he didn't see. He said he did things that he didn't do. He says he was at places where he wasn't.
Tr. 56. Attorney Shargel then gave examples of Rosemond's "false confessions," such as his claim that he met with an attorney in Los Angeles who, it turns out, was in Colorado on the date in question. Tr. 57. Attorney Shargel went on to reference in his opening an article written by Chuck Phillips: "[Phillips] said in the article, in the Los Angeles Times, that Jimmy Rosemond was responsible for the 1994 shooting of Tupac Shakur. He was not. Jimmy Rosemond was not involved in that shooting.... You will learn more about that during the course of the trial." Tr. 45. Attorney Shargel's stratagem having failed, Rosemond now lambastes his trial counsel for an opening statement that told the jury that "his own client told the government lies - and only lies - during his proffer sessions." Mem. at 46.
There was also a more significant reaction. Immediately after Attorney Shargel's opening, the government latched on to the reference in it to petitioner's non-involvement in the 1983 murder to argue that "Mr. Shargel has opened the door on the proffer statements" and presumed, somewhat brashly, that "all of the [proffer] statements are coming in." Tr. 59. In reply, Attorney Shargel acknowledged that this was his intended outcome, stating, "Well, I certainly opened the door intentionally and deliberately," Tr. 60, doubling down on his theory that "everything" Rosemond said during the proffer sessions "was untruthful." Tr. 61.
During its closing statement, the government "repeatedly relied on the fact that Mr. Rosemond confessed to the charged crimes," Mem. at 20, statements that were allowed into evidence, he complains now, because his trial counsel had opened the door to them. The government's "tenth reason" why the jury should convict Rosemond was that "the defendant confessed to being the boss" and that "[o]n nine separate occasions, represented by two able Counsel, the defendant met with the Government and confessed to his involvement in every crime for which he has been charged in this case." Tr. 2486.
In reality, though, the evidence extended far beyond his own words during the proffer sessions that his lawyer had branded as total lies. In traditional fashion, for example, one of the cooperating witnesses, Henry Butler, a member of the narcotics trafficking organization, would testify against him. Butler would reveal his pedigree on direct examination, testifying that he had previously pleaded guilty to being a felon in possession of a firearm; that he faced a minimum of ten years in prison;
*175 and that the government had offered him a cooperation agreement, in which it would file a "5(k)1 motion with the courts" to "allow[ ] the judge to sentence [him] below the minimum guideline" if he fulfilled his part of the agreement. Tr. 789-91,802.
The defense sought to buttress its theory that the evidence, including confessions that Rosemond had told the government and which had been retold to the jury, was a collection of lies. It called as a witness Scott Srebnick, a Miami-area lawyer, who Rosemond had retained to represent him in a potential libel action against the Los Angeles Times. Tr. 2435. The Los Angeles Times had published an article, later discredited, connecting Rosemond with the murder of Tupac Shakur. Tr. 2436-37.
On June 5, 2012, Rosemond was convicted on all counts. Dkt. No. 127. Rosemond moved for a new trial, in part based on what he claimed to be "juror misconduct," see Opp. at 33, and submitted to the court an affidavit by an individual, Jarrod Whittaker, who had met Rosemond ten years earlier and "wanted to write an article about his trial." See Mem. Ex. J ("First Whittaker Affidavit") ¶ 1-2. The First Whittaker Affidavit relates that Whittaker searched on his computer "to locate and interview one of the jurors" from Rosemond's trial, Austin Olatunji. Id. ¶ 4. Olatunji purportedly told Whittaker that two of his female co-jurors "made it very clear that they opined that James Rosemond was guilty due to his involvement in the Tupac thing." Id. ¶ 5.
The reported juror improprieties were raised by the defense at the time of sentencing. With apparent concern that the recollection of jurors be protected from taint by a frenzy of post-trial contact, the trial court barred the parties from contacting any of the jurors without prior judicial approval. Referring specifically to the Whittaker episode, the trial court warned counsel: "It's true in any case, but this case has the specter of - I'm referring now to the activity that got Mr. Rosemond into my courtroom.... And I'll accept that this Whittaker did this on his own. No one contacts jurors in this case on behalf of the defense or the prosecution without running it through me first. Okay? Understood?" Mem. Ex. F at 27. The court also orally denied the motion for a new trial. Id. Rosemond was then sentenced to a term of life imprisonment. Dkt. No. 244.
Rosemond's direct appeal to the Second Circuit advanced six grounds for relief:
• The denial of his Sixth Amendment right to conflict-free counsel, which Attorney Shargel purportedly could not provide because he was present for, and a witness to, Rosemond's proffer sessions;
• Juror misconduct violated his due process and fair trial rights;
• Error in the admission of evidence of the possession of cocaine base, for which Rosemond had not been charged;
• The imposition of a mandatory minimum term of life imprisonment for engaging in continuing a criminal enterprise ("CCE") was not supported by legally sufficient evidence;
• The CCE conviction, and that for the lesser included charge for conspiring to distribute cocaine, violated the Double Jeopardy Clause; and
• The government's use of his proffer statements at trial violated his Fifth Amendment right against self-incrimination.
United States v. Rosemond , No. 13-4262, 2014 WL 1871180, at *iii-iv (2d Cir. 2014). Each appellate point was rejected by the Circuit except for the claim of double jeopardy. Indeed, the government had conceded that point, and Rosemond's conviction *176 on the count charging conspiracy to distribute cocaine was ordered to be vacated as a lesser included offense of his CCE conviction. United Sates v. Rosemond ("Rosemond E.D.N.Y. Appeal") , 595 F. App'x 26, 31 (2d Cir. 2014) (summary order).
On March 10, 2016, Rosemond filed the instant petition, Dkt. No. 286, which included an out of the ordinary attachment in the form of an audio exhibit, supposedly a recording of an interview that Butler - the cooperating witness who had damned petitioner at trial - had engaged in with a "reporter." In that interview, Butler seemingly brags about what Rosemond describes as a "quid pro quo arrangement" with the government. See Mem. at 20; Mem. Ex. E. Specifically, Butler says that, in return for his cooperation, the government brought him sushi to eat, followed his son's football games and relayed statistics about his performance, allowed Butler access to an iPad, allowed him to eat barbeque, allowed visits with his wife and allowed Butler to "act like [he] had a proffer session" when, in reality, he was "ordering lunch" at the government's offices. Mem. at 20. Although the exact nature and authenticity of the recording are unsettled - Rosemond does not provide any information about the date or circumstances of the recording - the government assumes in its brief that the recording is authentic. Opp. at 17 n.9.
Also attached to the memorandum submitted by Rosemond on this petition is a new and improved affidavit by Whittaker, supplying more detail about alleged juror misconduct. See Mem. Ex. K ("Second Whittaker Affidavit"). Unlike the first, which mentioned nothing about it, the Second Whittaker Affidavit asserts that the co-jurors of tipster Olatunji "admitted they had researched Mr. Rosemond's connection with Tupac Shakur on the internet" and "broadly and generally conducted research on James Rosemond on the internet." Mem. Ex. K ¶ 2. Additionally, Whittaker opines that "[t]his is what bothered [Olatunji] specifically; so it was clear that he did not believe the female jurors were basing their conclusions on trial evidence." Id. ¶ 3.
Already on a winding road, even more twists would be revealed in Rosemond's habeas proceeding. Brought to new focus, for example, was the fact that Rosemond had also caught the eye of prosecutors in the Southern District of New York. Rosemond, in fact, was tried twice in the Southern District for the 2010 Fletcher murder, a topic of Rosemond's proffers in this case. Following a mistrial, Rosemond was convicted at a second trial and was sentenced to life in prison plus 20 years. See United States v. Rosemond ("Rosemond S.D.N.Y. Appeal") , 841 F.3d 95, 103-06 (2d Cir. 2016). Hope apparently springing eternal, Rosemond had similarly proffered in the Southern District in expectation of a cooperation agreement. Id. at 103. That failed effort brought the prosecution's use of his proffers at trial to the Second Circuit, which remanded, holding that the scope of the proffer agreement unduly restricted his counsel's presentation and argument to the jury. Id. at 106, 114. Petitioner's counsel has since filed a copy of that opinion in this action. Dkt. No. 295.[3] Without much clarity, petitioner argues that its reasoning and its relief be adopted here.
Statute Authorizing Review
A person who has been convicted and is currently a federal prisoner may *177 move the sentencing court to correct, vacate or set aside the sentence under 28 U.S.C. § 2255. The grounds for relief are very limited. A § 2255 court may only grant relief if it concludes: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' [or] (4) that the sentence 'is otherwise subject to collateral attack.' " Hill v. United States , 368 U.S. 424, 426, 82 S. Ct. 468, 470, 7 L.Ed.2d 417 (1962).
Discussion
I. Cooperation Agreement Denied
Rosemond first complains that the government violated his constitutional rights by refusing to offer him a cooperation agreement or, alternatively, submit a § 5K1.1 letter empowering the trial judge to a sentence him below mandatory minimums, after he had engaged with the prosecution in nine proffer sessions. Mem. at 27. Given that the decision on whether to extend a cooperation agreement or file a "substantial assistance motion," pursuant to U.S. Sentencing Guidelines § 5K1.1, is generally left to the government's discretion, United States v. DeFeo , 327 F. App'x 257, 258 (2d Cir. 2009), petitioner's argument faces a steep, uphill slog. Indeed, as explained by the Supreme Court, even with a cooperation agreement in place, the filing of a substantial assistance motion is not obligatory, balanced only by the grant of authority to "federal district courts ... to review a prosecutor's refusal to file a substantial-assistance motion and to grant a remedy if they find that the refusal was based on an unconstitutional motive." Wade v. United States , 504 U.S. 181, 185-86, 112 S. Ct. 1840, 1843-44, 118 L.Ed.2d 524 (1992). "Thus, a defendant would be entitled to relief if a prosecutor refused to file a substantial-assistance motion, say, because of the defendant's race or religion." Id. at 185-86, 112 S. Ct. 1840.
There is, in other words, a guard against arbitrariness. Clearly, the government's decision not to extend a cooperation agreement post-proffering or file a § 5K1.1 motion cannot "be wholly arbitrary - i.e., it must be rationally related to a legitimate government objective." United States v. Heatley , 39 F. Supp. 2d 287, 307 (S.D.N.Y. 1998) (Sotomayor, J.). But "generalized allegations of improper motive" do not suffice; a defendant must instead make a "substantial threshold showing" that the prosecutor acted based on an unconstitutional motive or arbitrarily. Wade , 504 U.S. at 186, 112 S.Ct. 1840. And in the absence of such a showing, courts "cannot disturb the government's decision." United States v. Roe , 445 F.3d 202, 207 (2d Cir. 2006).
Case law creates a burden that Rosemond cannot shoulder. He makes absolutely no showing, let alone a substantial threshold showing, that the government's refusal to extend a cooperation agreement was based on an unconstitutional motive or arbitrariness. Rosemond simply argues that the government withheld a cooperation agreement in "bad faith." He asserts that the government acted in a manner that was "irrational," "unsteady," "odd chronologically" and shifting over time, and this, petitioner intones, establishes "bad faith." See Mem. at 10-11, 12 n.2, 27, 35. This jumble of conclusory labels, however, is not evidence of motive or anything else. To be certain, the government explains that it had bona fide reasons to withhold a cooperation agreement from Rosemond. If he could not divine them then, the government makes them crystal clear now. The government found that Rosemond "continually" lied and committed criminal activity from jail over the course of his proffer sessions. Opp. at 12.
*178 It was for those reasons, the government says, that it declined to extend a cooperation agreement to him. Id.
Even though the decision does not deal with the refusal of the government to extend a cooperation agreement to a defendant who had disclosed his criminal acts to the government pursuant to some form of proffer agreement, Rosemond relies, principally, on United States v. Scarpa , 155 F. Supp. 3d 234 (E.D.N.Y. 2016), rev'd 861 F.3d 59 (2d Cir. 2017), cert. denied , --- U.S. ----, 138 S. Ct. 692, 199 L.Ed.2d 588 (2018), for the proposition that this Court must undertake on his § 2255 application a "bad faith" inquiry regarding the government's refusal to extend a cooperation agreement to him.[4] In Scarpa , the district court granted the defendant's motion to reduce his sentence based on his substantial assistance, notwithstanding the government's refusal to file a substantial assistance motion, which is a "threshold requirement" for a § 5K1.1 sentence reduction under Federal Rule of Criminal Procedure 35(b). Id. at 238.
It is easy to understand why Scarpa seemed so shiny an object to Rosemond. In granting relief, the district court determined that the government had "given a series of conflicting reasons" for its refusal to offer a substantial assistance motion. Id. at 239. The court noted that the reasons put forth did not "survive careful analysis," id. ; the United States Attorney's Office did not allege that the information provided by the defendant was not substantial, id. ; and the government was not "uniquely well-situated to evaluate the defendant's cooperation," which left "the court as the more appropriate evaluator." Id. at 239-40. The court also observed that, "quite significantly, the U.S. Attorney has been willing in the past to grant cooperation credit even to defendants who have committed serious crimes and have lied repeatedly during the course of their cooperation." Id. That is why Rosemond asserts that the holding in Scarpa applies with full force and dispositive effect here.
Misfortune would soon strike petitioner's argument. Any force Scarpa might have had has been hollowed. After Rosemond's habeas petition was fully briefed, the Second Circuit reversed the district court's opinion and held that the "nature and scope" of the district court's inquiry exceeded the court's authority and "imposed unwarranted constraints on the Executive Branch." United States v. Scarpa , 861 F.3d 59, 68 (2d Cir. 2017). "In sum," the Circuit Court ruled, "when the U.S. Attorney has refused to make a Rule 35(b) motion for reasons that are not invidious or unrelated to a legitimate government concern, it is not the office of the court to weigh the equities or reassess the facts underlying the government's exercise of its discretion." Id. at 69. Scarpa , therefore, provides Rosemond with little, if any, comfort.
In sum, Rosemond does not allege, nor establish, that the government acted unconstitutionally in declining to extend him a cooperation agreement or make a substantial assistance motion on his behalf.[5]
*179 Nothing in the record suggests that the government exceeded the bounds of its discretion. Accordingly, petitioner is not entitled to habeas relief on this basis.
II. Failure to Disclose Impeachment Material
Habeas relief is warranted, petitioner contends, because the government failed to disclose evidence that his trial counsel could have used to impeach Butler's credibility. As described earlier, none of the items on Rosemond's list of undisclosed impeachment materials involves anything related to Butler's exposure to criminal liability. Rather, founded on an audio recording of him, they all relate to the conditions of Butler's confinement in the period prior to taking the stand at trial to point the finger at Rosemond. In other words, without disclosure to the defense, and in return for his cooperation, petitioner argues that Butler received more than a § 5K1.1 substantial assistance letter.[6] Mem. at 39; see also supra Background (listing benefits).
Curiously, as the government observes, despite the critical importance of the audio recording to the claim he makes and despite the government's repeated requests for it, Rosemond has never "identified the date or source of the recording." Opp. at 17 n.9. Nonetheless, the government responds directly to the claim Rosemond bases on the recording and the essential thrust of his argument that Butler had a strong incentive to testify against him because of these undisclosed benefits, and that the government's failure to disclose them (or elicit testimony to that effect) violated his constitutional rights by denying him an effective opportunity to question him. Mem. at 39.
Having assumed the existence and accuracy of the tape's transcription for the sake of argument, the government then flatly denies Butler's supposed account of his treatment during his proffering and before he testified at trial. In evidentiary support, the government attached to its opposition papers two affidavits: one from DEA Special Agent Steven J. Miller, who investigated the case against Butler, and another from Butler's attorney, Jason Russo. Special Agent Miller attended many of Butler's meetings with the government. Opp. Ex. B. ¶ 4. One by one, Special Agent Miller contradicts each of Butler's various boasts. The Miller Affidavit avers, for example, that Butler never received sushi or barbeque (but did receive barbeque-flavored, rather than regular, potato chips); that Butler's son's football games were discussed with agents only in the ordinary course of case preparation; that Butler used Special Agent Miller's iPad but solely to look up telephone numbers of the "associates and coconspirators he was speaking about"; that Butler did not attend phony proffer sessions as a break from detention; and that, to the best of Special Agent Miller's knowledge, Butler did not have any "face-to-face contact" with his wife. Id. ¶ 6-10. For the most part, Attorney Russo's *180 account corroborated the Miller Affidavit, although he acknowledged that he, and not the government, had brought for his client sushi "on one occasion." Opp. Ex. C. ¶ 7.
The defense frames all of these benefits as "withheld information" that constituted "false testimony" when Butler did not disclose them while cross-examined by Attorney Shargel. See Tr. 893 ("Q: So, you are testifying here, as we have it, in return for a promise that if you tell the truth, you will be rewarded with a 5K1 letter, right? A: Yes.); see also Mem. at 41 ("This is precisely the type of misleading-yet-uncorrected testimony concerning a 'promise or benefit conferred.' ").
It is black letter law that a due process violation occurs when the prosecuting authority, "although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. People , 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The Second Circuit has established two slightly different tests for cases like these, involving alleged "perjury" or "false evidence." Under one test, a court must ask (i) "whether the perjury was material to the jury's verdict" and also (ii) the "extent to which the prosecution knew or should have known about the perjury"; under the other, whether (i) "the witness actually committed perjury" and whether the alleged perjury was (ii) material, (iii) known or constructively known to the government at the time of trial and (iv) undisclosed during trial. United States v. Ferguson , 676 F.3d 260, 282 (2d Cir. 2011) (contrasting tests under United States v. Wallach , 935 F.2d 445, 456 (2d Cir. 1991) and United States v. Zichettello , 208 F.3d 72, 102 (2d Cir. 2000) ). To make matters more complex, two standards of review exist based on whether the government had knowledge of the alleged perjury:
If the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. But where the government was unaware of the perjury, a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.
Ferguson , 676 F.3d at 280 n.19 (internal citations and quotations omitted).
All of these tests point to the same outcome here. First, petitioner avoids acknowledging that Butler's answer was an entirely truthful response to Attorney Shargel's question about the government's promise to him in connection with a prospective § 5K1.1 letter. The defense never asked Butler whether he had also received other benefits. Of course, it is no wonder why defense counsel did not go that far: the prospect of a substantial assistance motion was the single most important incentive Butler had to testify against Rosemond, and that information was already before the jury. The other benefits Butler boasts about were, at most, window dressing. To be sure, there is a world of difference between a witness falsely answering a question on cross-examination and, essentially, him not volunteering additional information that was outside the scope of the question asked.
Second, there is no evidence - other than a recording of undisclosed origin - that the government actually gave Butler any of these benefits. Rosemond fails to offer any reason why any weight should be given to the unsworn, uncorroborated account Butler supposedly gave an unknown reporter, at an unknown time and under unknown circumstances, much less even greater weight than to sworn affidavits *181 from a special agent assigned to the case and Butler's own attorney. The two affidavits disprove most of Butler's account.
Third, even assuming that the government did offer all of these so-labeled benefits, Rosemond still would not be entitled to habeas relief because there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. The jury was already aware that Butler was receiving perhaps the most valuable benefit of all: a potential sentence-reducing substantial assistance motion. Butler's testimony simply corroborated otherwise "suffocating evidence" of Rosemond's guilt, see Mem. Ex. F at 28-29, and his counsel had the opportunity to, and did, impeach Butler's credibility at trial. Butler testified about his decades-long history of crime, including "illegal gun-possession, a shooting, larceny, bribery, witness tampering, perjury, extensive drug use and trafficking, gang membership, use of aliases, and lies to federal agents (including lies related to this case)." Opp. at 21-22; see also Tr. 795-801. Defense counsel questioned Butler on his history of lying, especially his lies during the course of Rosemond's case, see, e.g. , Tr. 875, 890, 918, 926, and vigorously attacked Butler's credibility during summation:
But I suggest that this was not a small lie when Henry Butler told the Government, over and over again, that he had nothing to do with the Rolling 60 Crips [gang]. And other witnesses had said that he was a member and he kept denying it time after time after time. Denied it.
Finally, he discloses. You know when he discloses? After you folks are selected as jurors.
Tr. 2617-18. And, contrary to the picture Rosemond attempts to paint now - that Butler was a "star witness" on whose testimony the prosecution's case relied - the reality is that Butler was but one tile in a mosaic of evidence against Rosemond. Butler's testimony was corroborated by other sources, both with respect to his own role as a cocaine supplier, see Tr. 277-78, 393, 451, 1976, and Rosemond's role in obstructing justice. See Tr. 456-63, 483-89, 860-64, 2161-70.
Plainly, notwithstanding any purported failure to disclose "benefits" like upgraded meals and occasional iPad usage, jurors considered significant evidence central to Butler's credibility. Cf. United States v. Petrillo , 821 F.2d 85, 90 (2d Cir. 1987) (affirming district court's denial of motion for new trial when "the impeachment which the [previously undisclosed] evidence would have produced was already, in substance, before the jury"); United States v. Rosner , 516 F.2d 269, 273-74 (2d Cir. 1975) ("additional evidence tending further to impeach the credibility of a witness whose character had already been shown to be questionable" would not have caused jury to have reasonable doubt about defendant's guilt). Rosemond has failed to carry his burden under either test for prejudice outlined in Ferguson and, as a result, is not entitled to habeas relief.
III. Ineffective Assistance of Counsel
Seeking an entrée fairly standard on the menu of most collateral proceedings attacking a criminal conviction, Rosemond contends next that he was denied his Sixth Amendment right to the effective assistance of counsel, spotlighting two separate but related strategic decisions he claims were errors of constitutional dimension. First, he claims that he did not receive from counsel "adequate advice" before what he now views as his tragic agreement to partake in nine proffer sessions with the government. Mem. at 43. Second, he attacks Attorney Shargel's decision to then open the door at trial to the admission of *182 those proffer statements as "incoherent" and the crown jewel of his ineffective assistance. Id. After consulting with a "legal ethicist," Attorney Shargel submitted an affidavit that explained his reasons for both courses of action and firmly established that the strategy, though failed, was hardly "incoherent."[7] See Opp. Ex. F ¶ 4.
The evaluation of ineffective assistance of counsel claims is pegged to a two-step analysis. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." Strickland v. Washington , 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The second element is satisfied when the defendant demonstrates "that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Kimmelman v. Morrison , 477 U.S. 365, 375, 106 S. Ct. 2574, 2582-83, 91 L.Ed.2d 305 (1986). A court need not analyze the performance prong "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." Id. at 697, 104 S.Ct. 2052 ; cf. Brown v. Artuz , 124 F.3d 73, 80 (2d Cir. 1997) (disposing of ineffective assistance claim and not reaching performance prong where prejudice prong was not satisfied).
As for petitioner's first claim of ineffective assistance, missing from the record is any factual showing, as opposed to his bald, self-serving assertion, see Mem. at 44, that the risks of proffering were not explained to him before he agreed to engage in it. Even putting the Shargel Affidavit aside, Rosemond acknowledges that he received advice from counsel and only claims now that it was inadequate. But, beyond dispute, Rosemond also signed a proffer agreement in which he acknowledged, in writing, that his proffer statements could be used against him, but only "as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made" on his behalf at trial. See Opp. Ex. A. ¶ 3(c). In retort, he claims that his agreement to proffer was based on Attorney Shargel's inadequate advice that "if the proffer broke down, I would still be able to go to trial and assert a defense." Mem Ex. H. ¶ 4. Yet, the advice Rosemond says he received from counsel matches precisely what the proffer agreements allowed him to do if they did not blossom into a cooperation agreement: mount a defense. The clear language of the agreements, however, made as plain as day that certain defense tactics would trigger the government's right to admit some or all of *183 his proffer statements against him. Obviously, both client and counsel believed that pursuing a cooperation agreement was in petitioner's best interest and were aware that the proffers might fail and that failure would restrict the defense at trial, but that, as Attorney Shargel advised correctly, a defense could still be asserted.
There is nothing in the record that undermines this shared understanding. Attorney Shargel, for his part, says that it is his "customary practice to engage in an attorney proffer when a client is considering cooperation as an aid in determining whether" cooperation might be fruitful. Opp. Ex. F ¶ 5; see also Reich v. United States , No. 07-CV-2406 (NGG), 2010 WL 10373, at *4 (E.D.N.Y. Jan. 4, 2010) (citing United States v. Lewis , 117 F.3d 980, 984 (7th Cir. 1997) ) ("[C]ounsel does not render deficient performance by allowing his client to speak to government agents to lay a foundation for potential plea negotiations."). Given the depth and breadth of evidence totally unrelated to Rosemond's proffers adduced at trial pointing to his guilt, and that there is zero evidence in the record that he was so confident in his likelihood of success at trial that he did not want to pursue a cooperation agreement and the prized § 5K1.1 letter it would almost certainly afford, Attorney Shargel's decision to explain and recommend that Rosemond proffer in this context did not fall "below an objective standard of reasonableness." Strickland , 466 U.S. at 688, 104 S.Ct. 2052. The Court, therefore, need not address the second prong for petitioner's first ineffective assistance claim, though, without recapitulating facts to explain it, his argument certainly would falter there as well.
In a self-critique, Rosemond offers that his second ineffective assistance of counsel claim is more substantial than the first one. See Mem. at 46 (describing counsel's "actions at trial" as being "even more unreasonable" than his actions pre-trial). He argues that his counsel's attempt to discredit the proffer statements in his opening, see Tr. 56., was, figuratively, "attack[ing] the disease by killing the patient." Mem. at 46. He protests that Attorney Shargel's strategy to open the floodgates and allow the prosecution to admit Rosemond's inculpatory proffer statements was "incoherent" and "took so little caution" that it was constitutionally defective. Mem. at 47-48. Rosemond describes the resulting prejudice as "overwhelming," given that the "government's case was otherwise based largely on the inconsistent testimony of cooperators, whose credibility and motives were highly suspect." Mem. at 48.
Petitioner scrambles in a desperate attempt to point out ways that Attorney Shargel's strategy of attacking the truthfulness of his proffers merits the bombastic nature of his after-the-fact assault on it. See, e.g. , Mem. at 47 (strategy was a "titanic gamble").[8] Apparently believing it to be his best argument now, he reasons circularly, asserting that Attorney Shargel's strategy must have been incoherent because his original plan - to attack the veracity of the government's version of his proffer statements and then call his co-counsel as a potential witness to correct the record - is not what he ended up doing. Mem. at 46-47. Somehow, he says, all of this makes the resulting unconstitutionally deficient assistance of counsel "self-evident."
*184 Attorney Shargel embraces the strategy as deliberate and represents it was designed to "provide [Rosemond] the only meaningful opportunity to defend against the charges in the Indictment." Opp. Ex. F ¶ 6. Rather than it being an error or oversight, there was simply no need to call co-counsel as a witness. He would be needed only if the defense were to challenge the accuracy of the government's restatement of what Rosemond had proffered.
In simple truth, it was Rosemond's lies during the proffering that put the defense behind the eight-ball. Attorney Shargel was then confronted with the reality that, as the proffer agreements advised Rosemond in plain English, certain defenses would trigger the admission of his self-incriminating statements at trial. Attorney Shargel had to reshape his defense to meet that reality. What needed to be evaluated was whether a defense unfettered by concerns that it might trigger the admissibility of the proffers was better than a defense that attacked the believability of Rosemond's self-incrimination. The strategic choice by Attorney Shargel was, if at all erroneous, not so off the mark "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland , 466 U.S. at 687, 104 S.Ct. 2052.
In any event, it is not necessary to rest decision on this prong of Strickland because Rosemond clearly fails to carry his burden on the prejudice prong. To show prejudice under Strickland , "the likelihood of a different result" in the absence of the alleged deficiencies in representation "must be substantial, not just conceivable." Garner v. Lee , 908 F.3d 845, 862 (2d Cir. 2018) (reversing district court's grant of habeas petition and holding that defendant failed to establish there would have been "anything close to a substantial likelihood of a different result").
The government had an extraordinarily strong case against Rosemond, even absent his series of admissions. The trial judge's opinion at sentencing underscores the extent to which this was so:
I have no doubt ... that there was no way to present a meaningful defense in this case without fronting it and without making - taking the bold position, that Mr. Rosemond himself, like all the others, according to the defense in the case, proffered and spoke falsely to the government in doing so....
I really should emphasize that the evidence of guilt at the trial in this case was overwhelming. It was suffocating. There was extensive physical evidence, extensive accomplice testimony. The accomplices' testimony was cross-corroborating. It was fully corroborated by the other evidence in the case.
Mem. Ex. F at 28-29. The hand Attorney Shargel was dealt by Rosemond's lies also helps to explain why Strickland does not require courts to punish "gambles" that fail to carry the day. The interplay between Strickland 's two prongs creates a sort of sliding scale in a court's analysis. Stronger prosecutions frequently will prompt defense counsel to make gasp-inducing, Hail Mary passes; in these circumstances, however, prejudice - i.e. a reasonable likelihood of a different outcome - is less likely to occur. See Garner , 908 F.3d at 862 ("The prejudice inquiry is therefore ineluctably tied to the strength of the prosecution's evidence. A verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than a verdict or conclusion only weakly supported by the record.") (internal quotations and brackets omitted). Just as a quarterback might choose to make riskier passes when his team is down 50 points, leading disgruntled fans to jeer if those pass attempts result only in interceptions, *185 the fact is that the quarterback had little to gain by playing it safe and little to lose by taking an enormous risk. This high risk, high reward strategy is exactly what Rosemond, in the near perfect vision of hindsight, now criticizes.
Of course, Rosemond's argument would carry greater weight if the circumstances were such that the government's case-in-chief was so wafer-thin as to be doomed from the start. Attorney Shargel's strategy, given those facts, would have been needlessly risky. But Attorney Shargel, in his reasonable and professional judgment, believed that, given the air-tight case the government had here, opening the door to the introduction of those proffer statements was his best, and perhaps only, opportunity to obtain an acquittal. His strategy did not succeed, but it did not deprive Rosemond of the effective assistance of counsel.
IV. Juror Misconduct
The final ground advanced to support habeas relief rests on the allegation that two jurors conducted independent research about petitioner during the course of trial. This is Rosemond's third bite at the same apple. In moving post-verdict for a new trial, Rosemond submitted the First Whittaker Affidavit, which gave Whittaker's account of what juror Olatunji had heard from two of his co-jurors. See Mem. Ex. J. That motion was denied, but the argument was revived before the Second Circuit on direct appeal, where it was again rejected. Rosemond E.D.N.Y. Appeal , 595 F. App'x at 29-30. This post-conviction collateral proceeding marks the appearance of the Second Whittaker Affidavit, which purports "to clarify what Mr. Olatunji told [Whittaker] about this matter." Mem. Ex. K ¶ 2. As Whittaker now remembers it, Olatunji did not simply relay to him that the co-jurors convicted Rosemond because of the (unspecified) "Tupac thing," but rather they had "broadly and generally conducted research on James Rosemond on the internet." Id.
The government argues that Rosemond's claim is "procedurally barred" because it was raised, and rejected, on direct appeal. Opp. at 37. Rosemond presses that any procedural bar does not apply as a result of the trial court's order that prevented counsel from contacting jurors without its prior consent, see Mem. Ex. F at 27, and, thus, neither the trial court nor the Second Circuit had an opportunity consider the "facts" set forth in the Second Whittaker Affidavit. Rosemond also contends that any procedural default should be excused because of ineffective assistance of his appellate counsel.[9] See Mem. at 53. Without passing on the government's argument that this claim has been defaulted, the Court will consider Rosemond's argument, especially given that the Second Circuit's decision hinged, in large measure, on the absence of what the Second Whittaker Affidavit now purports to produce: an allegation that jurors conduct independent research in violation of the trial court's instructions.
1. Consideration of Information Outside the Record
Almost seven years since verdict, there is not a speck of direct evidence that any Rosemond juror accessed or considered any information about petitioner or the matter in controversy other than that which was revealed in the courtroom by Rosemond's own counsel at trial. All that petitioner offers is the double hearsay account of a non-juror, about what a juror told him, of what he heard two other jurors say - indeed, an account that was revised years after it was first determined *186 to be factually insufficient to support relief. Rosemond nonetheless contends that this provides "reasonable grounds" to believe that jurors were "exposed to improper influences." Mem. at 50. It is on this basis that Rosemond urges the Court to invade one of the most sacrosanct institutions in America's justice system: the jury.
Indeed, the sacrosanctity of the jury box is long standing, and for good reason. Reopening the jury box after a verdict is reached is heavily disfavored:
We are always reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." United States v. Moon , 718 F.2d 1210, 1234 (2d Cir. 1983), cert. denied , 466 U.S. 971, 104 S. Ct. 2344, 80 L.Ed.2d 818 (1984). As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.
United States v. Ianniello , 866 F.2d 540, 543 (2d Cir. 1989). Still, there are circumstances in which, at a minimum, a post-trial evidentiary hearing is necessary. Id. (denying motion for new trial but holding that affidavits of three jurors, "swearing that three improper events took place during jury deliberations, two involving the judge and one involving a federal marshal," required an evidentiary hearing).
Yet, when the fog of argument lifts, one bedrock principle looms: juror consideration of information relevant to the matter on trial, procured by a juror independently, standing alone, is not enough to find a Sixth Amendment violation. A showing of prejudice is also required. For that reason, courts "typically proceed immediately" to a determination of whether the error was harmless, "assuming without deciding that a Sixth Amendment violation has occurred." Loliscio v. Goord , 263 F.3d 178, 185 (2d Cir. 2001) (internal citation and quotation omitted). Notably, the Second Whittaker Affidavit purports not only to convey what a juror was supposedly told by two other jurors who may have conducted extra research, but is also dressed as providing what the Second Circuit had observed was missing from the First Whittaker Affidavit. Because of the perceived custom tailoring of Whittaker's latest account, the government assails it as being too little, too late, and asserts that the history of Whittaker's unsolicited and persistent involvement in this lawsuit suggests that yet another Whittaker Affidavit might be just around the corner.
As its critiques of Whittaker suggest, the government tries mightily to short-circuit any inquiry, citing the Third Circuit's decision in United States v. Fumo for the proposition that "double-hearsay" affidavits, like the First and Second Whittaker Affidavits, do not warrant evidentiary hearings. The Third Circuit, however, did not squarely address the district court's characterization of "defense counsel's double-hearsay affidavit ... as lacking the 'clear, strong, substantial, and incontrovertible evidence that a specific, nonspeculative impropriety occurred.' " 655 F.3d 288, 306-07. Instead, the court based its ruling on the absence of a showing of prejudice. Id. ("[E]ven if everything reported ... about what Juror 2 learned from her co-workers were true, it would not be sufficient for a showing of 'substantial prejudice.' ").
Likely underscoring the rarity of any attempted intrusion of the jury's province, case law on whether "double hearsay" is enough to substantiate juror misconduct is slim. But, in cases where evidentiary hearings *187 were required, the linchpin is a statement or action traceable to a member of the jury. See, e.g., United States v. Zimny , 846 F.3d 458, 472 (1st Cir. 2017) (remanding for "further investigation" after juror admitted to authoring comments on a blog post about the defendant during trial); United States v. Resko , 3 F.3d 684, 687 (3d Cir. 1993) (remanding for new trial when juror "approached a court officer and told him that the members of the jury had been discussing the case during their recesses"). And often, even that is not enough. See, e.g., United States v. Cox , 324 F.3d 77, 85 (2d Cir. 2003) (finding no abuse of discretion in district court's handling of juror who admitted telling a legal secretary for the government in a break that she was bored and sleepy during trial).
Cutting to the chase, with the internet age's broadened definition of "media," no matter how explicit and persistent the admonitions of the trial judge may be, it is virtually impossible in a high visibility case to keep the jury's consideration of the material facts limited entirely to the record. That is why a violation of the trial court's admonition not to research independently or consider facts outside the record, standing alone , cannot warrant an invasion of the jury's decision making. There must be some evidentiary showing that any violation of the trial court's instruction not to do any independent research and to consider only evidence in the record affected the defendant to his detriment. All that Rosemond offers is the Second Whittaker Affidavit, which falls well short of any such showing. To the extent the affidavit recounts Whittaker's journalistic impression of juror Olatunji's unsworn understanding of what he recalls two other unidentified jurors as saying, it carries little, if any, weight.
Moreover, putting aside Whittaker's impressions of what he thought Olatunji believed or now says he believes, a hearing cannot be justified based merely on Olatunji's comment that he had overheard conversations between two of his co-jurors, in which they said that they had researched Rosemond's "connection with Tupac Shakur on the internet"; "found information attributing" the shooting of Mr. Shakur to Rosemond; and also "broadly" researched Rosemond on the internet." Mem. Ex. K ¶ 2. That is so because, even crediting the double hearsay, although the conduct of Olatunji's co-jurors would have violated standard instructions given to them, none of this suggests the kind of prejudice that would require an evidentiary hearing. To conclude otherwise would be to overlook the obvious. Beyond the overwhelming evidence of guilt, Rosemond, essentially, admitted all of the facts supposedly unearthed by the two jurors, including his (debunked) connection to the murder of Tupac Shakur, in the proffer statements introduced at trial. See, e.g. , Tr. 2435-37 (examination of Scott Srebnick about libel action Rosemond contemplated bringing against the Los Angeles Times in response to the newspaper's connecting him with the murder of Mr. Shakur).
At bottom, there is no showing, even crediting Whittaker's double-hearsay affidavit, that any of the jurors learned harmful information about Rosemond not otherwise revealed at trial or that, in light of the actual evidence, there was any overall prejudice. Consequently, even assuming that a violation of the trial court's instruction regarding juror conduct occurred here, in the absence of demonstrable prejudice, case law does not countenance an evidentiary hearing into the jury's decision making.
2. Harmless Error
Furthermore, this conclusion is buttressed by the application of harmless error analysis. Assuming only for argument *188 that jurors consulted information outside the record, that they shared it with the other jurors and that the jury relied on it, Rosemond would not be entitled to relief if the government demonstrated that the misconduct was harmless. Clearly, although it "is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial[, a] government showing that the information is harmless will overcome this presumption." United States v. Greer , 285 F.3d 158, 173 (2d Cir. 2002) (internal citation omitted). Additionally, "a district court must be careful that it does not itself 'create prejudice by exaggerating the importance and impact' of extra-record information." United States v. Farhane , 634 F.3d 127, 169 (2d Cir. 2011).
The government primarily relies, as support for the proposition that any error was harmless, on Fumo . See United States v. Fumo , 655 F.3d 288 (3d Cir. 2011). Vincent J. Fumo, a former Pennsylvania state senator, was convicted of fraud, tax evasion and obstruction of justice. Id. at 294. While jurors were deliberating, a television station reported that one of the jurors ("Juror 1") had made "dozens" of comments on his Facebook page and another comment on Twitter. Id. at 298. Fumo moved to disqualify Juror 1, but the district court denied the motion. Id. at 299. After the verdict but before sentencing, Fumo moved for a new trial and attached the affidavit of defense counsel, which asserted "that journalist Ralph Cipriano, writing for Philadelphia Magazine , had contacted [counsel] regarding information he obtained during post-verdict interviews with several jurors." Id. Cipriano asserted that all of the jurors had heard about Juror 1's Facebook and Twitter comments, and further, that another juror ("Juror 2") was informed by her coworkers that Fumo's prior conviction had been overturned. Id. Juror 2's coworkers also told her that an acquaintance of Fumo was currently in prison for fraud. Id.
Fumo moved for a new trial based both on Juror 1's use of Facebook and Twitter and Juror 2's exposure to excluded evidence. Id. at 304-07. First, the Third Circuit observed that the district court had questioned Juror 1 "in camera at length about his comments online and his efforts to avoid media coverage of the case." Id. at 305-06 ; see also id. at 305 ("[I]t does not follow that every failure of a juror to abide by that prohibition will result in a new trial."). As a result, there was "no plausible theory for how Fumo suffered any prejudice, let alone substantial prejudice, from Juror 1's Facebook and Twitter comments." Id. at 306 ; cf. United States v. Ganias , 755 F.3d 125, 132 (2d Cir. 2014) ("A juror who ... posts comments about the trial on Facebook, may, in certain circumstances, threaten a defendant's Sixth Amendment right to an impartial jury. Those circumstances, however, are not present here.") (internal footnote omitted).
Likewise, here, to the extent that any purported view of a juror regarding the defendant on trial became public, it occurred after trial - not in an online post by a juror but in a double-hearsay account of a journalist. That distinction might weaken the magnitude of the claimed harm, but would not in and of itself overcome the presumed harmfulness of the claim misconduct.
But, more significant to the circumstances here, with respect to Juror 2's exposure to extra-record information, the Third Circuit looked at six factors to determine "whether there was substantial prejudice":
• (1) Whether the extraneous information related to one of the elements of the case;
*189 • (2) The extent of the jury's exposure to the extraneous information;
• (3) The time at which the jury received the extraneous information;
• (4) The length of the jury's deliberations and the structure of the verdict;
• (5) The existence of jury instructions from the court about considering only evidence developed in the case; and
• (6) Whether there was a heavy volume of incriminating evidence.
Id. at 307. The court held that the first and fourth factors weighed in Fumo's favor but were "easily overwhelmed by the second, fifth and sixth factors, which weigh heavily against a finding of substantial prejudice." Id. The facts that the conviction occurred almost 30 years earlier (and was overturned); that the district court gave "careful and repeated instructions" to the jurors to limit their deliberations to only the evidence at trial; and that there was a "heavy volume" of incriminating evidence were sufficient to find that prejudice was absent. Id.
Uncontradicted facts in the record in this collateral proceeding make clear that an evidentiary invasion into the jury's deliberative process is unwarranted because, applying those facts to the harmless error analytical framework, it is crystal clear that any error attributable to juror misconduct here was harmless. Specifically, the only hot button information that the Second Whittaker Affidavit surmises the researching jurors might have obtained related to a shooting occurring in 1996, more than 15 years before trial and which the jury was told at trial had nothing to do with Rosemond. Moreover, the record demonstrates that the trial judge properly charged the jury on considering only the evidence presented at trial. Lastly, and quite significantly, there was a heavy volume of incriminating evidence, including the testimony of five cooperating witnesses corroborated by physical evidence that firmly established Rosemond's guilt.
The conclusion that neither an evidentiary hearing nor a new trial be afforded to Rosemond is well supported by relevant Second Circuit case law. The Circuit has affirmed findings of harmless error in cases involving a wide range of conduct where jurors were unlikely to reach a different result; for instance, where an "unbalanced" and "disturbed" juror was excused after making accusatory comments about the defendant to co-jurors, see United States v. Peterson , 385 F.3d 127, 136 (2d Cir. 2004) (reasoning that the "remaining jurors already disbelieved the excluded juror"); where a juror, during the trial of a CPA for mail fraud, reviewed a textbook on bookkeeping and read an excerpt to his co-jurors that explained a CPA's responsibilities and training, see United States v. Weiss , 752 F.2d 777, 782 (2d Cir. 1985) ; and where an unredacted transcript of grand jury testimony was submitted to the jury without affording defendants an opportunity to respond, see United States v. Simmons , 923 F.2d 934, 944-45 (2d Cir. 1991) (ruling that the redacted testimony was "cumulative" of evidence introduced at trial).
The path forward here is clear. Rosemond relies on a second version of a journalist's double-hearsay affidavit, submitted years after trial, in sole support of a third bite at upsetting the decision-making of a jury without the slightest showing that the alleged misconduct of the two jurors caused an iota of prejudice. An evidentiary hearing invades the secrecy that safeguards the functioning of one of the most sacrosanct institutions of our criminal justice system. The facts presented here do not require such a hearing. Any error in *190 the conduct of the jury was demonstrably harmless.
V. Unsealing
Finally, the government requests that the documents filed by the parties related to this petition be unsealed. See Opp. at 2 n.1. Rosemond's counsel responded that it had originally filed the petition and supporting materials under seal because several of the exhibits were filed under seal previously. See Reply Mem., Dkt. No. 294, at 2 n.1. Consequently, because neither party has made a persuasive showing that the documents concerning Rosemond's habeas petition remain under seal, and notwithstanding that they might contain copies of documents otherwise under seal, the Court orders that they be unsealed. See Dkt. Nos. 286, 293-95.
Conclusion
For the foregoing reasons, Rosemond's request for an evidentiary hearing in furtherance of his application to vacate his conviction and sentence is denied, as is his petition for a writ of habeas corpus , which is ordered dismissed.
Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. See 28 U.S.C. § 2253(c)(2).
The Clerk of Court is directed to enter judgment accordingly and to close this case.
So Ordered.

Reprieve was fleeting. Rosemond, ultimately, was convicted at a third trial in the Southern District and, once again, sentenced to life imprisonment. See Dkt. No. 626, United States v. Rosemond , No. 10 -cr-431-LAK-7 (S.D.N.Y.).

Rosemond also cites United States v. Roe , in which the Second Circuit held that a defendant had made the requisite showing that the government acted in bad faith in denying him a substantial assistance motion, and that the district court was required to hold an evidentiary hearing. 445 F.3d 202, 204 (2d Cir. 2006). Roe is inapposite here, however, because the government there had offered, and the defendant had accepted, a cooperation agreement. Id. Thus, Roe involved a question over whether the government had fulfilled its end of the bargain in a signed agreement. No such agreement existed here.

Additionally, Rosemond, through his counsel, admitted that his proffers were full of lies. He cannot now reverse course and claim that they were truthful and helpful. Tellingly, Rosemond does not claim that he never lied during those proffers, even though truthfulness was a core promise made as part of his proffer agreements. See Opp. Ex. A ¶ 2 (government agreed to restrict use of defendant's statements "except [in] a prosecution for false statements, obstruction of justice, or perjury with respect to acts committed or statements made at or after the Meeting."). Plainly, Rosemond's tacit admission that he failed to be completely truthful in his proffers convincingly demonstrates the government had a proper motivation and did not act arbitrarily when it declined to extend him a cooperation agreement.

There is no dispute that Butler truthfully testified at trial about his cooperation agreement with the government. See Tr. 789-99.

Although courts are naturally hesitant to permit an attorney to disclose communications otherwise protected by the attorney-client privilege, courts are "unanimous" that an attorney is permitted to do so to defend against an ineffective assistance of counsel claim. United States v. Pinson , 584 F.3d 972, 978 (10th Cir. 2009) ("Given the ample, unanimous federal authority on point, we hold that when a habeas petitioner claims ineffective assistance of counsel, he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim."); see also United States v. Gallego , No. S1 95 CR. 284 (LAK), 1996 WL 662904, at *1 (S.D.N.Y. Nov. 13, 1996) ("By moving for a new trial based on the alleged ineffectiveness of counsel, Martinez put in issue various communications between himself and his counsel and, at least to that extent, waived his attorney-client privilege."). Finally, closing the loop, the Court is satisfied that Attorney Shargel's affidavit is confined to the facts pertinent to Rosemond's ineffective assistance of counsel claim and does not divulge any other information Attorney Shargel learned during the course of his engagement with Rosemond.

To the extent Rosemond argues that Attorney Shargel had a conflict of interest in calling into question his own client's truthfulness, that argument was already considered and rejected by the Second Circuit on the ground that the trial court's inquiry was satisfactory. See Rosemond E.D.N.Y. Appeal , 595 F. App'x at 28-29.

Rosemond was represented on appeal by Matthew M. Robinson, Esq.